**Constantine L. HAMPERS, M.D., Plaintiff, Appellant,**

v.

**W.R. GRACE & CO., INC., W.R. Grace & Co.–Conn., Inc., National Medical Care, Inc., Fresenius National Medical Care Holdings, Inc., Defendants, Appellees.**

No. 99–1362.

United States Court of Appeals, First Circuit.

Heard Oct. 7, 1999.

Decided Jan. 28, 2000.

---

D. Lloyd Macdonald, with whom Andrew C. Glass and Kirkpatrick & Lockhart, LLP were on brief, for appellant.

Michael R. Pontrelli, with whom Thomas Elkind, Lawrence M. Kraus, and Epstein, Becker and Green, P.C. were on brief, for appellees.

Before STAHL, Circuit Judge, CYR, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

This appeal requires us to decide whether the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, 29 U.S.C. § 1001 *et. seq.*, preempts a common law cause of action for lump sum contract damages where the alleged breach involves the failure of a former employer to enroll the plaintiff in an ERISA-regulated employee pension benefit plan. The plaintiff, Dr. Constantine Hampers, demanded a jury trial on his common law breach of contract claims against defendants, W.R. Grace and Company, W.R. Grace and Company–Connecticut, (collectively, "Grace"), National Medical Care, Inc. ("NMC"), and Fresenius National Medical Care Holdings, Inc. ("Fresenius"). The district court rejected his demand, finding that ERISA preempted Hampers's state law claims. On appeal, Hampers argues that, with respect to defendant Grace, the

trial court erred in finding his claim preempted. For the reasons stated below, we affirm.

## I. BACKGROUND

In 1968, as an associate professor at the Harvard Medical School and a nephrologist specializing in end-stage renal disease, Hampers co-founded NMC, a company that provides dialysis treatment to patients through private clinics. In a series of transactions between 1984 and 1989, Grace purchased a 100 percent equity interest in NMC, and began operating it as a wholly-owned subsidiary. In 1989, Hampers negotiated an employment agreement that, among other things, provided for his participation in the National Medical Care, Inc., Retirement Plan (the "NMC qualified plan").[1]

In 1990, J.P. Bolduc became president and chief operating officer of Grace, and he invited Hampers to become an executive vice president of Grace and director of its health care group, which included NMC. On February 22, 1991, Bolduc sent a letter to Hampers proposing terms for a new employment agreement with Grace that was to include membership in the W.R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace qualified plan") and the W.R. Grace & Co. Supplemental Executive Retirement Plan (the "Grace SERP").[2] This agreement provided Hampers with more benefits than he was previously entitled to under the NMC qualified plan because at that time NMC did not have a supplemental executive retirement plan (SERP) of its own.

Hampers and Bolduc decided that the February 22 letter would be the basis of their agreement, and they turned the drafting over to their attorneys. Before the agreement was executed, however, Grace identified a problem with the proposed benefit scheme: Hampers's participation in the Grace qualified plan could jeopardize the plan's tax-preferred status. Accordingly, Grace's lawyers redrafted the agreement, providing Hampers with a cash benefit equal to what they estimated he would have received under the Grace qualified plan and Grace SERP.

Although these changes were acceptable to Hampers, Grace's Salary, Incentive Compensation and Employee Benefits Committee found the terms too rich and refused to approve them. Instead, the compensation committee, and ultimately Grace's board of directors, approved a modified version of the agreement which capped Hampers's retirement benefits at $300,000 per year. Hampers reluctantly accepted the modified terms, and Grace's lawyers reduced them to writing, providing that Hampers's pension

> shall be equal to the amount by which (a) the lesser of (i) three times the actual pension benefit payable to him under NMC's retirement plan (beginning in the year in which he terminates employment with Grace) or (ii) $300,000 exceeds (b) the amount of the actual pension benefit payable to him under NMC's retirement plan at that time.

In July 1991, Hampers and Bolduc executed the agreement (the "1991 Agreement").

Four years later, NMC's earnings had skyrocketed, and NMC employees demanded a richer benefits package. In response, Grace's board created in November 1995 the "National Medical Care, Inc. Supplemental Executive Retirement Plan" (the "NMC SERP").[3] In 1996, Grace

---

1. A "qualified" plan is one that qualifies for special tax advantages under the Internal Revenue Code.

2. Supplemental retirement plans do not qualify for tax-preferred status like "qualified plans." Supplemental plans are used to offer top executives additional benefits that could

not be offered under a qualified plan without jeopardizing the qualified plan's tax-preferred status.

3. As Hampers states in his complaint, the NMC SERP is an "employee benefit plan" within the meaning of ERISA § 3(3), 29

transferred ownership of NMC to Fresenius. On June 14, 1996, Hampers retired. Upon retirement, Hampers inquired about his retirement benefits. He learned from Grace that he was not a participant in the NMC SERP. He also learned that if he had been a participant in the NMC SERP, his aggregate retirement annuity (from the combined NMC qualified plan and NMC SERP) would have totaled more than $500,000. On January 2, 1997, Hampers filed the present suit, asserting that he was wrongly denied participation in the NMC SERP.

In his complaint, Hampers contended that "when a SERP for NMC senior executives ... was created in or about November 15, 1995, Grace caused Dr. Hampers to be excluded from the NMC SERP, and NMC so excluded Dr. Hampers." According to Hampers, this exclusion was a breach of the 1991 Agreement because under that agreement he was "entitled to the full pension benefits of the NMC retirement plan as it existed on the date of his retirement, specifically including such benefits under the NMC qualified plan and the NMC SERP." In his view, the reference in the 1991 Agreement to "NMC's retirement plan" entitled him to participate, not only in the NMC qualified plan, which existed at the time of contracting, but also in any additional retirement bene-

fits that Grace might establish for NMC in the future.

In a count of the complaint titled "ERISA: The NMC SERP," Hampers asserted that the "NMC SERP is an 'employee benefits plan' under ERISA," and Grace "exercised and exercise[s] discretion and authority or control respecting the management, disposition and administration of the NMC SERP, including but not limited to, the discretion of who is to be included for participation in the NMC SERP." Thus, Hampers contended, "[b]y virtue of the terms of the 1991 Agreement," Grace had a "duty to include Dr. Hampers as a participant in the NMC SERP," and "breached the duty."

Hampers sought a declaration that he is a participant in the NMC SERP and an order directing his enrollment in the NMC SERP with annuity disbursements adjusted to reflect such participation. Hampers also requested "damages for the loss caused by [the defendants'] illegal conduct, including interest, costs and attorneys [sic] fees pursuant to 29 U.S.C. § 1132(g) [ERISA § 502(g) ] and other applicable provisions of law." Finally, Hampers demanded a jury trial on all matters triable before a jury.

The defendants moved for summary judgment on the grounds that the 1991

U.S.C. § 1002(3). More specifically, the NMC SERP is an "employee pension benefit plan." *See* ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

Pursuant to ERISA § 3(36), 29 U.S.C. § 1002(36), the NMC SERP is an "excess benefit plan," or "a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 [the Internal Revenue Code of 1986] on plans to which that section applies, without regard to whether the plan is funded." It is colloquially referred to as a "top hat" plan—i.e., a plan that provides certain highly compensated employees with retirement benefits in addition to, and on top of, the benefits provided by the employer's qualified plan.

As "a plan which is unfunded and maintained by an employer primarily for the pur-

pose of providing deferred compensation for a select group of management or highly compensated employees," the NMC SERP is exempt from ERISA's participation and vesting rules (the ERISA 200's), *see* ERISA § 201(2), 29 U.S.C. § 1051(2); ERISA's funding rules (the ERISA 300's), *see* ERISA § 301(a)(3), 29 U.S.C. § 1081(a)(3); and ERISA's rules of fiduciary responsibility (the ERISA 400's), *see* ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1). However, as an "employee benefit plan," the NMC–SERP is governed by ERISA's reporting and disclosure rules (the ERISA 100's), *see* ERISA § 101(a), 29 U.S.C. § 1021(a), and ERISA's criminal and civil enforcement provisions (the ERISA 500's), *see* ERISA § 501, 29 U.S.C. § 1131(criminal enforcement); ERISA § 502, 29 U.S.C. § 1132 (civil enforcement), including ERISA's preemption provision, ERISA § 514(a), 29 U.S.C. § 1144(a).

Agreement contained no promise of participation in any future NMC SERP. In opposition to the motion, Hampers argued that the term "NMC retirement plan" in the 1991 Agreement could not be construed to leave out future participation in the NMC SERP, as "[b]y its very terms, the NMC SERP is inextricably linked to and dependent on the Qualified Plan." Indeed, he argued, eligibility for the NMC SERP depends on a formula that includes benefit accrual under the NMC qualified plan. As the only purpose of the SERP is to confer enhanced benefits on highly compensated executives without contravening the limits on qualified plans set by the tax code, Hampers contended that the two plans must be construed together to comprise one seamless retirement package. In the end, the district court denied summary judgment, finding that there was "more than one reasonable construction of the term 'NMC retirement plan.'"

The defendants then moved to strike Hampers's demand for a jury trial on the grounds that the NMC SERP was an ERISA plan and that ERISA preempted Hampers's state law cause of action. Characterizing the issue as a "close question," the district court granted the defendants' motion, ruling that ERISA preempted Hampers's state law contract claims.

The court then conducted a ten day bench trial at which the defendants disputed Hampers's reading of the 1991 Agreement, arguing that the term "NMC retirement plan" referred to the NMC qualified plan, the plan that existed at the time of contracting, and did not promise inclusion in a future NMC SERP as Hampers contended. At the conclusion of the trial, the district court, invoking principles of New York state contract law, found no evidence that the parties intended Hampers's retirement benefits to include benefits under the NMC SERP, and entered a judgment in favor of the defendants. On appeal, Hampers does not contest the district court's application of contract law; rather, he argues that the trial court erred in denying his demand for a jury trial on his claim for lump sum contract damages against defendant Grace. Because the district court's denial of Hampers's request for a jury trial resulted from its legal ruling that his claim was preempted by ERISA, we review the trial court's decision *de novo*. *See Golas v. HomeView Inc.*, 106 F.3d 1, 4 (1st Cir.1997) (Bownes, J., concurring); *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 792–93 (1st Cir.1995).

## II. ERISA PREEMPTION

### A. General Principles

 As noted, this case requires us to decide whether ERISA's preemption clause applies to Hampers's state law cause of action.[4] That preemption clause, section 514(a), 29 U.S.C. § 1144(a), provides:

> Except as provided in subsection (b) of this section, the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan....

---

**4.** "[T]he Supremacy Clause, U.S. Const. art. VI, may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Hampers's common law breach of contract claim is not in "conflict" with ERISA as ERISA contains neither substantive rules of contract construction, *see, e.g., Ham-* *mond v. Fidelity Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992), nor a general remedy for contract damages, *see, e.g., Turner v. Fallon Community Health Plan, Inc.*, 127 F.3d 196, 198 (1st Cir.1997). Because there is no assertion in the case that preemption is "implied," we are left to address only whether Hampers's claim against Grace is "expressly" preempted by ERISA's preemption clause, ERISA § 514(a), 29 U.S.C. § 1144(a).

(emphasis added). "The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1). Discerning the meaning of § 514(a) requires us to construe the language of a congressional statute. Therefore, "[t]he question whether a certain state action is pre-empted by federal law is one of congressional intent." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (internal quotation marks and citation omitted). Express "ERISA preemption analysis . . . involves two central questions: (1) whether the plan at issue is an 'employee benefit plan' and (2) whether the cause of action 'relates to' this employee benefit plan." *McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 36 (1st Cir.1998). Because the NMC SERP is an ERISA-regulated "employee benefit plan," our preemption analysis focuses on whether Hampers's cause of action "relates to" the NMC SERP.

In adopting § 514(a), Congress deliberately rejected narrower preemption language directed at "state laws relating to the *specific subjects* covered by ERISA," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (emphasis added), choosing instead to supplant all state laws that "relate to" ERISA-regulated plans. In *Shaw*, the Supreme Court observed that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* This "early attempt[ ] by the Supreme Court to interpret ERISA's preemption clause relied heavily upon textual analysis and a dictionary definition of 'relate to,' " *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E.W. Howell Co.*, 126 F.3d 61, 66 (2d Cir.1997), and led to the conclusion that ERISA preemption was "conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). Indeed, ERISA preempts a state law that has a connection with or refers to an ERISA-regulated benefits plan, "even if the law is not specifically designed to affect such plans, or the effect is only indirect and even if the law is consistent with ERISA's substantive requirements." *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (internal quotation marks and citations omitted); *see also Rosario–Cordero v. Crowley Towing & Transp. Co.*, 46 F.3d 120, 123 (1st Cir.1995) ("[A] state law may relate to an employee benefit plan even though the law does not conflict with ERISA's own requirements . . . .").

Yet, from ERISA's inception, the Supreme Court recognized that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan," *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. 2890, and that such "is the case with many laws of general applicability," *Greater Washington Bd. of Trade*, 506 U.S. at 130 n. 1, 113 S.Ct. 580. Drawing the line between those state laws that "relate to" ERISA-regulated plans, and those that are only "tenuous, remote, or peripheral" has proven considerably difficult in practice, producing an "avalanche of litigation." *De Buono v. NYSA–ILA Med. & Clinical Serv. Fund*, 520 U.S. 806, 809 n. 1, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (collecting Supreme Court ERISA preemption cases and documenting the enormous volume of cases in the lower federal courts). This case calls upon us to once again draw such a line.

In drawing that line, we find cases emphasizing ERISA's carefully crafted civil enforcement scheme particularly relevant.[5]

---

5. ERISA § 502(a), 29 U.S.C. § 1132(a), provides in relevant part:

 (a) Persons empowered to bring a civil action
 A civil action may be brought—

 (i) by a participant or beneficiary—

 . . . .

 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his

*See, e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Ingersoll–Rand,* 498 U.S. at 143–44, 111 S.Ct. 478; *Fitzgerald v. Codex Corp.,* 882 F.2d 586, 588 (1st Cir.1989) (concluding that preemption extends to "causes of action within the scope of the civil enforcement provisions of ERISA."). In *Pilot Life,* the Supreme Court concluded that "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be *exclusive.*" *Id.* at 54, 107 S.Ct. 1549 (emphasis added).[6] The Court explained:

> In sum, the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined

if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Id.*[7]

Similarly, in *Turner v. Fallon Community Health Plan,* 127 F.3d 196 (1st Cir. 1997), we found state common law claims preempted after determining that they fell within ERISA's exclusive civil enforcement regime. The plaintiff brought breach of contract and other state law claims, and a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), against a health maintenance organization, charging that it wrongly denied a request to fund a certain cancer treatment. *See id.* at 197–98. The plaintiff sought compensatory damages, arguing "that if ERISA provided no federal [damages] remedy, it ought not be read to preempt his state-law claims;" alternatively, "if ERISA preempted the state-law claims, then a federal remedy ought to be inferred or created by the court to permit damages for wrongful withholding of treatment under the employee benefits plan." *Id.* at 198. We rejected both arguments,

---

rights to future benefits under the terms of the plan;

 (2) ... by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [ERISA § 409: "Liability for Breach of Fiduciary Duty"];

 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

6. In *Pilot Life,* the plaintiff sued the insurance company responsible for providing disability benefits under the employer's benefits plan. *See* 481 U.S. at 43, 107 S.Ct. 1549. After the plaintiff suffered an injury and his claim for disability benefits was denied, he brought suit alleging a state law cause of action for, inter alia, tortious breach of contract. *See id.* at 43–44, 107 S.Ct. 1549. The Court held that "[t]he common law causes of action ... each based on an alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for preemption under § 514(a)." *Id.* at 48, 107 S.Ct.

1549. The Court then considered whether the claims were nonetheless exempted from preemption by ERISA's insurance saving clause, § 515(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A), and in so doing stated that "our understanding of the saving clause must be informed by the legislative intent concerning the civil enforcement provisions provided by ERISA § 502(a), 29 U.S.C. § 1132(a)." *Id.* at 52, 107 S.Ct. 1549.

7. The Court expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop" similar to the federal common law that developed under § 301 of the Labor Management Relations Act of 1947 (LMRA), upon which ERISA § 502(a) was modeled. *Pilot Life,* 481 U.S. at 52, 56, 107 S.Ct. 1549. Importantly, "Congress was well aware that the powerful pre-emptive force of the LMRA displaced all state actions for violation of contracts between an employer and a labor organization, even when the state action purported to authorize a remedy unavailable under the federal provision." *Id.* at 55, 107 S.Ct. 1549.

finding the state law claims preempted and declining the plaintiff's invitation to fashion a federal remedy not authorized by ERISA's remedial scheme. *See id.* at 198–200. First, we concluded that ERISA § 501(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides a remedy to "secure *benefits* under the plan rather than *damages* for a breach of the plan." *Id.* at 198 (emphasis added). We noted that "the Supreme Court has stressed that ERISA does not create compensatory or punitive damage remedies where an administrator of a plan fails to provide the benefits due under that plan." *Id.* (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). We emphasized that Congress's decision not to allow causes of action for damages under ERISA "is not a minor technicality: damage awards may increase effective coverage but may also add significantly to the costs of coverage." *Id.* at 198–99. Second, we held that although "[a]bsent preemption, a health benefits plan ... could certainly be treated as a contract enforceable under state law and subject to the usual contractual remedies, including compensatory damages," ERISA's preemption clause "preclude[s] state claims to enforce rights under an ERISA plan or obtain damages for the wrongful withholding of those rights." *Id.* at 199.

While we acknowledged in *Turner* that the Supreme Court has "set some new limits on preemption," we stressed that ERISA continues to preempt "a state's attempt to provide state remedies for what is in essence a plan administrator's refusal to pay allegedly promised benefits." *Id.* at 199. Such reasoning is consistent with, and indeed supported by *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695

(1995), the case in which the Supreme Court first acknowledged the unworkability of a literal reading of ERISA § 514(a)'s "relate to" standard, and ruled that courts must "look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." [8] According to the *Travelers* Court, ERISA's purpose was " 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law.' " *Id.* at 656, 115 S.Ct. 1671 (quoting *Ingersoll–Rand*, 498 U.S. at 142, 111 S.Ct. 478). The Court identified three categories of state laws that "relate to" ERISA plans in such a way that preemption of those laws furthers this purpose: (1) state laws that "mandate[ ] employee benefit structures or their administration," (2) state laws that "bind plan administrators to [a] particular choice," and (3) state law causes of action that provide "alternative enforcement mechanisms" to ERISA's enforcement regime. *See id.* at 658–59, 115 S.Ct. 1671. The third category has particular relevance for our present inquiry. In this vein, we have stated that in order to assess whether the state law cause of action is an alternative enforcement mechanism, we must "look beyond the face of the complaint" and determine the real nature of the claim "regardless of plaintiff's ... characterization." *Danca v. Private Health Care Sys., Inc.*, 185 F.3d 1, 5 (1st Cir.1999).

**B. Hampers's State Law Contract Claim**

█ Hampers's complaint alleged a cause of action under ERISA based on precisely the same conduct that underlies his state law contract claim. In particular, in Count III of the complaint, entitled "ERISA: The NMC SERP," Hampers asserted that by virtue of the 1991 Agree-

**8.** In *Travelers,* commercial insurers who were fiduciaries for ERISA plans and their trade organizations challenged a New York statute that imposed surcharges on hospital rates for patients covered by commercial insurers. *See Travelers,* 514 U.S. at 649–50, 115 S.Ct. 1671.

The plaintiffs argued that ERISA preempted the New York law since the statute imposed additional costs on ERISA-regulated plans that purchased commercial insurance. *See id.*

ment, Grace had a "duty to include Hampers as a participant in the NMC SERP," and breached that duty by "causing him to be excluded from the NMC SERP." In Count II of the complaint, entitled, "Contract: Retirement Benefit," Hampers argued that under the terms of the 1991 Agreement with Grace he was "entitled to the full pension benefits of the NMC retirement plan as it existed on the date of his retirement, specifically including such benefits under the NMC qualified plan and the NMC SERP." Hampers contended that "when a SERP for NMC senior executives ... was created in or about November 15, 1995, Grace caused Dr. Hampers to be excluded from the NMC SERP, and NMC so excluded Dr. Hampers." According to Hampers, this conduct constituted a breach of the 1991 Agreement. That the very same conduct—Grace's failure to include Hampers in the NMC SERP—underlies both Hampers's state law contract claim and his ERISA-benefits claim suggests that the state law claim is an alternative mechanism for obtaining ERISA plan benefits.

As relief, Hampers primarily sought benefits under the NMC SERP. First, he sought a declaratory judgment that he is "entitled to participate in the NMC SERP and is entitled to receive all such benefits as to which he is entitled under the NMC SERP," and he petitioned the court to "order that Grace ... cause Hampers to be enrolled in the NMC SERP forthwith and cause the NMC SERP to disburse to Hampers his rightful annuity as of January 1, 1997 at such amount as he would have been entitled to had Hampers been included in the SERP from the day of its creation on or about November 15, 1995." Moreover, even with respect to Hampers's state law claim for contract damages, he asserts that "upon a Jury's finding that Grace is liable to Dr. Hampers under the 1991 Agreement ... [,] the district court [would] have to face the issue of the appropriateness of an injunctive order directed to NMC and Fresenius that they enroll Hampers in the NMC SERP."

Hampers's complaint requested "damages for the loss caused by [the defendants'] illegal conduct, including interest, costs and attorneys [sic] fees pursuant to 29 U.S.C. § 1132(g) [ERISA § 502(g) ] and other applicable provisions of law." Hampers therefore linked his claim for damages to a request for attorneys' fees authorized under ERISA, but not authorized under state law. Moreover, in attempting to prove the "illegal conduct"—Grace's decision to deny him participation rights in the NMC SERP—Hampers relied on the terms of the NMC SERP, arguing that because the SERP defines its benefits with respect to the NMC qualified plan, the term "NMC retirement plan" in the 1991 Agreement must include both the qualified plan and the SERP. We have consistently held that a cause of action "relates to" an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action. *See McMahon v. Digital Equip. Corp.,* 162 F.3d 28, 38 (1st Cir.1998); *Boston Children's Heart Found., Inc. v. Nadal–Ginard,* 73 F.3d 429, 440 (1st Cir.1996); *Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d 790, 793–94 (1st Cir.1995); *Vartanian v. Monsanto Co.,* 14 F.3d 697, 698–99 (1st Cir.1994). Finally, Hampers measured his damages by reference to the NMC SERP, contending that, as a participant, he would have been entitled to approximately $250,000 per year in additional annual pension benefits. We have held that ERISA preempts state law causes of action for damages where the damages must be calculated using the terms of an ERISA plan. *See Carlo,* 49 F.3d at 794.

█ Hampers concedes that as against defendants NMC and Fresenius, his breach of contract claim is properly preempted because "the relief he seeks is inclusion in the NMC SERP." As against Grace, however, Hampers insists that he "must necessarily and exclusively seek money damages due to the fact that Grace

no longer has any authority or control over the NMC SERP," having transferred its ownership of NMC to Fresenius in August 1996 and relinquished all administrative duties relating to the NMC SERP. Thus, Hampers admits that his claim against Grace would have been preempted if Grace had not, subsequent to the time of its alleged breach of the 1991 Agreement, relinquished its responsibility over the NMC SERP.

The mere fortuity that Grace, subsequent to the occurrence of the conduct at issue in this case, relinquished its responsibility over the NMC SERP does not affect the ERISA preemption analysis. Hampers's claim is directed at Grace's alleged breach of its promise to enroll him in the NMC SERP. Specifically, Hampers argues that under the 1991 Agreement he was "entitled to the full pension benefits of the NMC retirement plan as it existed on the date of his retirement, specifically including such benefits under the NMC qualified plan and the NMC SERP," but that "Grace caused Dr. Hampers to be excluded from the NMC SERP, and NMC so excluded Dr. Hampers." Thus, the wrongful conduct alleged by Hampers involves a determination of whether benefits will be paid under an ERISA-governed plan. In deciding not to enroll Hampers in the NMC SERP, Grace was acting in its capacity as an ERISA employer and fiduciary with responsibility over the administration of the plan.[9] If Grace had not exercised "discretion and authority or control respecting the management, disposition and administration of the NMC SERP, including but not limited to, the discretion of who is to be included for participation in the NMC SERP," as Hampers asserted in his complaint, Grace simply could not have been in breach by failing to use its "discretion," "authority," or "control" to include Hampers in the SERP.

Thus, it is *only* by virtue of Grace's status as an ERISA employer with direct control over the administration and operation of the NMC SERP that Grace could have breached the 1991 Agreement in the way Hampers insists that it did. Consequently, this is not a case where the defendant is being sued for wrongful conduct committed in its individual capacity, *see, e.g., Wilson v. Zoellner,* 114 F.3d 713, 715 (8th Cir.1997) (claim of misrepresentation against an insurance agent); *Stetson v. PFL Ins. Co.,* 16 F.Supp.2d 28, 29 (D.Me. 1998) (same); *see also Golas* v. *HomeView Inc.,* 106 F.3d 1, 4 (1st Cir.1997) (Bownes, J., concurring) (claim brought against insurance broker acting in his individual capacity), nor is this a case where the defendant is a third party insurer or service provider who is not an ERISA entity— plan, employer, participant, beneficiary, fiduciary—at all, *see, e.g., Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 991 (10th Cir.1999) (claims against insurer for misconduct in selling life insurance); *Geweke Ford v. St. Joseph's Omni Preferred Care, Inc.,* 130 F.3d 1355, 1357 (9th Cir.1997) (contract claims against third party provider of insurance and administrative services); *Arizona State Carpenters Pension Trust Fund v. Citibank Arizona,* 125 F.3d 715, 717–18 (9th Cir.1997) (claims against bank providing custodial services); *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1460–61 (4th Cir.1996) (malpractice claim against insurance professionals).

## C. Conclusion

In summary, we conclude that Hampers's state law contract claim against

---

**9.** Grace was an ERISA fiduciary with respect to the NMC qualified plan but not with respect to the NMC SERP as the supplemental retirement plan is not subject to ERISA's rules governing fiduciaries. *See supra* note 3. This fact, however, does not affect the preemption analysis in this case as Grace, in deciding to deny Hampers participation rights in the SERP, acted in its capacity as Hamper's employer. An employer, like a fiduciary, is an ERISA entity. *See, e.g., Stetson v. PFL Ins. Co.,* 16 F.Supp.2d 28, 33 (D.Me. 1998) ("The primary ERISA entities are the employer, the plan, the plan fiduciaries, and the beneficiaries of the plan.").

Grace "relates to" the NMC SERP within the meaning of ERISA's preemption clause because Hampers's state law claim is an alternative to his claims for NMC SERP benefits against Grace, NMC, and Fresenius brought under ERISA.[10] We base this conclusion on these factors: (1) Hampers's state law claim against Grace alleges precisely the same conduct that underlies his claims for SERP benefits under ERISA; (2) the relief requested by Hampers focuses primarily on NMC SERP benefits; (3) finding Grace liable for breach of contract might require the court to order the NMC SERP to pay plan benefits; (4) the only claim for damages in the complaint is linked to a request for attorneys' fees under ERISA; (5) Hampers calculates the amount of his alleged damages by reference to the NMC SERP; (6) the central liability question at issue in his state law claim against Grace—whether the 1991 Agreement promised him inclusion in the NMC SERP-must be viewed in light of the terms of the NMC SERP and the NMC qualified plan; and (7) Grace's decision to deny Hampers participation rights in the ERISA-regulated plan—the conduct at issue in the state law claim—resulted from a decision made by Grace in its capacity as an ERISA employer with responsibility and authority over the ERISA-regulated plan. Accordingly, the district court did not err in finding Hampers's state law claim against Grace preempted and denying his demand for a jury trial.

*Affirmed.*

---

**10.** Because we conclude that Hampers's state law claim is an "alternative enforcement mechanism" to ERISA's exclusive enforcement scheme, we need not address Grace's contentions that the 1991 Agreement is itself an ERISA-governed plan, or that waiver or judicial estoppel prevented Hampers from asserting his claim for lump sum contract damages so late in the litigation process.