Hopkins, Merita A., J.
Introduction
The plaintiff Maria Miara (“plaintiff’ or “Miara”) brought this suit against the defendants seeking damages resulting from the allegedly faulty performance of an insurance product. This action is now before the court on the defendants’ Joseph Bonasera (“Bonasera”) and the First Allmerica Financial Life Insurance Company (“Allmerica”) motions for summary judgment. For the following reasons, the defendants’ motions are ALLOWED in part and DENIED in part.
Background
The undisputed facts and disputed facts viewed in the light most favorable to the plaintiff are as follows. In or about 1989, plaintiff and her husband Richard (“Richard”) (collectively “the Miaras”) owned and operated an entity known as New England Chain Link Fence Co., Inc. (“NECLF”). Affidavit of Maria Miara (“Miara Aff.”) ¶4. Plaintiff Miara was a principal of NECLF and held the role of executive vice president. In or about mid-1989, plaintiff and her husband contacted one Gary M. Baker (“Baker”) of the entity now known as Baker Associates Insurance Agency (“Baker Associates”) to inquire about the purchase of a pension plan for NECLF and its employees.[2] Miara Aff. ¶3.
Baker proposed a meeting and suggested the presence of Bonasera in his capacity as a representative of the company now known as Allmerica. Miara Aff. ¶5. Between late 1989 and early 1990, Miara, Richard, Baker, and Bonasera met at least twice to discuss various plans. Id. At these meetings the Miaras “repeatedly” emphasized their desire to have the plan include survivor spouse benefits, owing to the fact that Miara was substantially younger than her husband. Id. Baker and Bonasera ultimately recommended that the Miaras purchase a Defined Benefits Plan (“DBP”), and represented to the plaintiff that under the DBP the “Pension Benefit Guaranty Corporation (“PBGC”) guaranteed 100% spousal benefits in the event that anything was to happen to either [Miara or her] husband.” Miara Aff. ¶6.
Two especially relevant documents emerged as a result of these meetings: (1) a Notice to Policyholder [of] Approval of Group Annuity Contract No. GA-91547A (the “contract”); and (2) a Summary Plan Description (the “summary” or “plan summary”). Joint Appendix at Nos. 6 and 7; Miara Aff. ¶¶9-12. Given the sweeping import of these documents to the case sub judice, they will be described at length.
Miara received the contract from Allmerica on December 22, 1989. The document contains numerous dates and signatures. On a cover page, NECLF is listed as the policyholder, and Miara’s signature as “Exec v. President/Clerk” appears. Just below her signature the “date signed” line reads April 6, 1990. The following page, which contains provisions such as the recitation of consideration and the choice of laws, lists the “effective date of contract” as September 1, 1989 and lists the “date of contract issuance and execution” as October 12, 1990. The policyholder is listed as and the contract is issued to NECLF.
Of particular relevance is §6.01 of the contract. It reads, in relevant part, as follows.
While the employer hopes and expects to continue the Plan indefinitely and every effort has been made to arrange the Plan so that it will meet future conditions insofar as they can be foreseen, the Employer . . . reserves the right to terminate the plan at any time. [I]n the event of a termination or partial termination of this Plan each affected Participant’s Accrued Benefit shall be fully vested and nonforfeitable to the extent funded or as guaranteed by PBGC. Each Participant affected by the termination or partial termination shall have recourse only to the assets then held by the Plan. . . (Emphasis added.)
Miara looked at the contract, but “did not review the boilerplate language in the multi page (sic) contract nor [did she] have any attorney or advisor review it for [her].” Miara Aff. ¶11.
In or about July 1990, Miara received the plan summary. Miara Aff. ¶12. That document features general explanatory text followed by a question and answer section, the relevant portions of which are as follows (with emphasis added).
If you die prior to becoming eligible for an early retirement benefit your spouse will receive a benefit *66 equal to 100% of what you would have received had you:
(a) terminated employment on the date of your death;
(b) survived until your earliest retirement age; and
(c) retired at your earliest retirement age under the 100% Contingent Annuitant option.
Q: What circumstances can affect the amount of benefit I receive?
A: The following are major circumstances that can affect the amount of benefit you receive:
(1) If the plan is amended. It is expected that the plan will be continued indefinitely and every effort has been made to design it so that it will meet future conditions. However, your employer retains the right to change the plan at any time if economic or other conditions make it necessary. Aside from amendment required by the federal government, no amendment can reduce the benefit being paid to retired participants, or your accrued benefit.
(2) If the plan is terminated. If economic or other conditions make it necessary, your employer has the right to terminate this plan partially or completely. Termination of the plan is subject to the prior approval of the Internal Revenue Service (IRS) and the PBGC, when required. If the plan terminates, the funds held by the plan will be used only for the benefit of participants and beneficiaries, until all benefits are provided.
(3) If you get divorced, the court may direct that all or part of your benefit be paid to an alternate payee. This alternate payee will generally be your ex-spouse or your children./ The plan administrator will notify you upon receiving such an order and will tell you what effect it has on your benefit.
Q: What happens at Termination of Plan?
A: Your full earned benefit will be protected to the extent that the funds in the plan are sufficient to provide the benefit or, if they are not sufficient, to the extent that the benefits are insured by the federal government through the PBGC.
If funds are insufficient to provide full benefits, they will be allocated in accordance with the priority order listed in the plan.
To the extent that plan assets exceed the plan liability for the benefits described above, any excess amount not required to be returned to employees by the federal government may be returned to your employer.
Q: What benefits are guaranteed by the PBGC?
A: Generally the PBGC guarantees most vested normal retirement benefits, early retirement benefits and certain disability and survivor’s pensions. However, the PBGC does not guarantee all types of benefits under covered plans, and the amount of benefit protection is subject to certain limitations.
The PBGC guarantees vested benefits at the level in effect on the date of plait termination. However, if a plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before plan termination, a portion of the plan’s vested benefits or the benefit increase may be not guaranteed. In addition, there is a ceiling on the amount of monthly benefit that PBGC guarantees. This amount is adjusted annually to reflect changes in the wage-index base as determined by the Social Security Administration. The maximum benefit in 1989 based on a life annuity payable at age 65 is $2,028.41 monthly.[3] (Emphasis added.)
Early on in the life of the DBP, in late 1992, NECLF began missing the required payments. In fact, NECLF failed to make even one payment on the DBP at any time after 1992. Miara Dep. I at 156-61; Allmerica’s Proposed Stmt, of Facts ¶65-68. NECLF accordingly froze the DBP effective October 1, 1992. Allmerica’s Stmt, of Undisputed Facts ¶66.
Ultimately, Miara wound up wearing multiple hats throughout the course of events giving rise to this suit: principal of NECLF, executive vice president and clerk of NECLF, plan administrator of the DBP for NECLF (on behalf of the plan beneficiaries), and plan beneficiary herself.
Richard Miara passed away on August 22, 1996, as the result of an automobile accident. Miara. Aff. ¶15. Miara alleges that shortly after Richard’s death she contacted Bonasera, and that Bonasera advised her to close NECLF, place it into bankruptcy, and file for a distress termination with PBGC. Id. Heeding his advice and tacking in a direction that greatly benefited herself (without regard to other beneficiaries of the DBP) Miara hired two professionals, actuary Kenneth Anderson (“Anderson”) and bankruptcy attorney Leonard Berkal (“attorney Berkal”), both of whom assisted her in filing a distress termination of the DBP, see infra, and with placing NECLF into bankruptcy. Miara Aff. ¶16. Miara alleges that she never discussed with Anderson or Berkal the 1989-1990 conversations she had had with Baker and Bonasera concerning survivor benefits under the DBP. Id.
On October 8, 1996, Miara received a letter from Allmerica containing death benefit information for Richard Miara. Miara Aff. ¶17; Joint Appendix at No. 18. The letter set forth two options. Id. Miara could either choose (1) to begin to receive benefit payments on September 1, 1996 and receive a monthly payment of $1,382.80 or (2) defer payment until February 1, 2002, at which time she would receive $2,457.27 per *67 month. Id. The letter instructed her to indicate her preference in writing, which she did by letter dated December 4, 1996, indicating that she chose the deferral option, number two. Miara Aff. ¶18.
Approximately one month later, on January 6, 1997, Allmerica again wrote Miara to inform her that the October 8 letter was in error as to the scope of her benefits. Miara Aff. ¶19; Joint Appendix at No. 17. The new letter set forth three new benefit distribution options: (1) Miara could defer payment until February 1, 2006, at which point she would receive $2,664.35 per month; (2) Miara could begin payments effective September 1, 1996 and receive $1,382.80 per month; or (3) Miara could defer payments until February 1, 2002, at which point her monthly distribution would be $1,952.97. Id. The letter further indicated that, absent an indication otherwise, Miara would begin to receive payments under option (1). Miara took no such action and, accordingly, expected to begin receiving a monthly payment of $2,664.35 beginning in February 2006. Miara Aff. ¶20.
In late July of 1997, Miara, apparently acting in her capacity as administrator of the DBP, sent a letter to DBP participants informing them of an impending distress termination. Allmerica’s Prop. Stmt, of Facts ¶136 (admitted by plaintiff). In the year that followed, the DBP was terminated (pursuant to an Intent to Terminate form signed by Miara) and the PBGC was appointed trustee and took over the plan. Id. at ¶¶135-36.
In her role as executrix of her late husband’s estate, Miara engaged attorney Jacob Segal (“attorney Segal”) to prepare the requisite estate tax filings. Miara Aff. ¶25. In this capacity, attorney Segal prepared both a state and a federal tax return package. Joint Appendix at Nos. 14 & 15. As executrix of the estate, Miara signed each of the tax returns in 1997. Id. Although Miara claims that at the time she signed the returns there were no attachments to them, Miara Aff. ¶26, both of the packages (as they exist in the Joint Appendix to the defendants’ motions) include a letter from Anderson (the actuary) to attorney Segal’s law firm.[4] Id. These letters read, in relevant part:
In accordance with the terms of the [DBP], Maria Miara ... is entitled to a monthly pension of $1,383.99, payable for her life commencing as of August 22, 1996 . . . The value of this pension on August 22, 1996 was $193,003.
The [DBP] is in the process of submitting to the PBGC a request for a distress termination for their approval. At the current time, and at Mr. Miara’s death, the assets are, and were, less than the value of accrued benefits in the [DBP]. As a result, the PBGC may require Maria Miara to forego part of her benefit as a substantial owner of the employer so that non-owner participants can receive their full benefits. We do not know whether this possibility would have any effect on the valuation of the spouse’s pension for Federal Estate Tax purposes. (Emphasis added.)
In a letter dated June 12, 2002 and addressed to the estate of Richard A. Miara, the PBGC informed Miara, in her role as executrix of her late husband’s estate, that under the remnants of the DBP, she was entitled to a monthly payment of $531.76 for the remainder of her life. Joint Appendix at No. 26. Miara, having still been expecting to receive monthly payments in the earlier-quoted amount of $2,664.35, appealed this decision. Id. PBGC denied her appeal on the grounds that she and her husband were “substantial owners”'of the company and, presumably, that the PBGC reduced payouts to substantial owners in situations where plan assets were needed to fully compensate other, non-owner plan beneficiaries.[5] Id.
Procedural History
Miara filed this action on September 15, 2004. Plaintiff later amended her complaint, and it now sets forth seven counts against the defendants: (1) promissory estoppel; (2) negligent misrepresentation; (3) malpractice; (4) breach of contract; (5) breach of guaranty; (6) breach of the covenant of good faith and fair dealing; and (7) violation of the Massachusetts Consumer Protection Act, G.L.c. 93A. On October 19, 2004, defendants Baker and Baker Associates filed a petition for removal with the United States District Court for the District of Massachusetts. The plaintiff thereafter timely moved to remand. In a Memorandum and Certification, Judge Young certified a question of law[6] to the United States Court of Appeals for the First Circuit and ordered that if the First Circuit in its discretion chose not to respond to the certified question, that the case be remanded to this court. Miara v. First Allmerica Ufe Ins. Co., Inc., 379 F.Sup.2d 20, 108 (2005).[7] A remand order entered on June 9, 2006, and the case returned to this court.
Discussion
I. Summary Judgment Standard
This court may grant summary judgment only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the initial burden of showing the absence of a triable issue and that the summary judgment record entitles him to judgment as a matter oflaw. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991). A moving party may satisfy this burden by submitting evidence that negates an essential element of the nonmoving party’s claim or by showing that the nonmoving party has no reasonable expectation of proving an essential element of his case at trial. Kourouvacilis, 410 Mass. at 716. To avoid summary *68 judgment, the nonmoving party must introduce enough countervailing evidence to demonstrate the existence of a genuine issue for trial. Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999).
II. Statute of Limitations
The defendants assert that the plaintiffs claims are barred by the statutes of limitation. The plaintiff counters that the statutes of limitation were equitably tolled for a period of time by the discovery rule. Under the discovery rule, a claim is equitably tolled until the plaintiff learns or objectively should have learned (1) of the existence of her injury and (2) who or what was the cause of her injury. Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990). Phrased differently, the discovery rule tolls the statute of limitations when the wrong was “inherently unknowable” to the plaintiff.[8]
“A plaintiff who invokes the discovery rule by claiming that her delay in filing suit stems from a failure to recognize the cause of her injuries bears the burden of proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge.” Doe v. Creighton, 439 Mass. 281, 284 (2003); Lindsey v. Romano, 427 Mass. 771, 773-74 (1998). Issues under the discovery rule are generally factual in nature and “in most instances will be decided by the trier of fact.” Riley v. Presnell, 409 Mass. 239, 240 (1991). The plaintiff bears the burden of proof as to applicability of the discovery rule. As such, she must demonstrate “a reasonable expectation of proving that her suit was timely filed” to survive summary judgment. Doe, 439 Mass. at 284.
Here, the defendants argue several points in time when Miara either should have become aware of her injuries or, alternatively, was in fact charged with actual knowledge of them.
A.The Execution of the Contract
The defendants first argue that the statute of limitations should have begun to run against Miara at the time NECLF executed the contract.[9] The defendants rely on the language in the contract in Section 12.10, as quoted supra. Of primary import is whether this language in fact contradicts the representations made to Miara that the DBP would guarantee benefits were anything to happen to Richard. Section 12.10 indicates that benefits and PBGC guarantees may be limited to substantial owners in certain situations including, among others, plan termination. Miara could reasonably have understood that this contractually-sophisticated language, in light of the representations made to her, did not affect her rights under the plan. That is, she could have reasonably understood herself to be outside the definition of a substantial owner in light of the representations made to her by Baker and Bonasera.
Moreover, the plaintiff has set forth in her affidavit that she was not on actual notice of this provision. This court cannot say, therefore, that as a matter of law Miara should have known by a reading of the contract that the representations made to her by Baker and Bonasera were untrue. Reviewing this statement in the light most favorable to the plaintiff, it would not seem that the plaintiff would have actual knowledge of harm until requesting a termination of the DBP in or about 1997-98 and being advised of its consequences after approval in 2002.
B.Miara’s Receipt of the Plan Summary
The defendants’ next argument is that the statutes of limitation began to run when Miara received the plan summary. To reiterate, the thrust of Miara’s misrepresentation claim is that the defendants represented to her that benefits would be PBGC-guaranteed if anything were to happen to her significantly-older husband. If the Court accepts Miara’s premise that she relied on the guidance given to her by the two insurance professionals, Baker and Bonasera, then Miara’s lack of knowledge as to her injury at the time she received the plan summary was reasonable, because the underfunding and termination of the DBP were not factors at that time and were future events.
C.Miara’s Signature of Richard’s Estate Tax Returns
The defendants next argue that Miara had actual notice of her injury in 1997 when she signed the estate tax returns for her husband’s estate. Defendants emphasize in their argument that Miara signed these returns and that, in so doing, she was charged with actual knowledge of all information contained therein and appended thereto, especially the above-quoted letter from Anderson to Segal relevant to the DBP.[10] Miara, however, has set forth in her affidavit that she signed the estate tax returns at a time when there were no attachments appended thereto. Moreover, attorney Segal testified in his deposition that he only “would assume” that the letter was included in the estate tax package when Miara signed it. Therefore, there exists a genuine issue of material fact as to whether Miara either actually knew or should have known of the contents of the letter. Moreover, even if Miara knew of the contents of the letter, there is no notice of actual harm — the letter only suggests a possible future event. Accordingly, this question must be decided by a juiy.
D.Is Miara Charged with the Knowledge of her Advisors?
The defendants next argue that Miara was charged with actual knowledge that the DBP did not comport fully with Baker and Bonasera’s representations because her advisors (Anderson, Berkal, and Segal) had knowledge of the true workings of the DBP. In support of this proposition, the defendants cite to Quinn v. Hintlian, 4 Mass.App.Ct. 805, 805 (1976), which in turn cites to Flynn v. Wallace, 359 Mass. 711, 717-18 (1971), which states that: “notice to an agent in the business or employment which he is carrying on for his principal is a constructive notice to the principal himself . . .” (Emphasis added.) At the very least, a *69 question of fact exists as to whether the respective professionals were engaged on Miara’s personal behalf.[11] Anderson and attorney Berkal were presumably engaged by NECLF to assist in the distress termination of the DBP and the bankruptcy filing for NECLF; attorney Segal was presumably engaged by Richard’s estate or by Miara acting in her capacity as executrix of Richard’s estate. Assuming, arguendo, that no dispute of fact exists, the statute of limitation would not begin to run because Miara is not imputed with the actual or constructive notice to the agents of NECLF or Richard’s estate. Summary judgment on this issue is therefore inappropriate.
III. PBGC Letter of June 12, 2002
This court finds that as a matter of law the statute of limitation on Miara’s misrepresentation claim began to run when she received the June 12, 2002, letter from PBGC. This letter informed her that the benefits she was to receive would be in an amount of $531.76, a number far less than the well-over $2,000.00 she would receive monthly if the PBGC “guaranteed 100% spousal benefits.”
IV. ERISA Preemption
As a preliminary matter, preemption is a question of law properly decided by a court. Commonwealth v. Federico, 383 Mass. 485,486 (1981). Accordingly, this court must grant summary judgment in favor of the defendants if it finds Miara’s claims to be preempted by ERISA.
The defendants assert that the discovery process in this case “has revealed that the only damage (sic) Miara seeks to recover from the defendants in this action is the difference between ‘the benefit that [she] was told she would receive minus what the PBGC is paying’ her,” and that, as such, her claim falls “squarely” under ERISA and is therefore preempted. Def. brief at 19-20.
The plaintiff, on the other hand, relies upon the reasoning of Judge Young’s order “that the plaintiff [is] not challenging the plan or its administration, . . . that the claims of the plaintiff arose from individual liability under state law[,] . . . that the misrepresentations as to promised benefits related only indirectly to the plan[,] that the plaintiff was not seeking ERISA benefits, did not assert rights under ERISA, and (sic) was not seeking to negate ERISA provisions, and that ‘[a]ny money damages awarded would not affect an ERISA plan but would be the responsibility of the defendants . . .’ ” PI. brief at 20-21; Miara v. First Allmerica Financial Life Ins. Co., 379 F.Sup.2d 20 (2006).
A. The Statutory Framework and the Standard
The preemptive sweep of ERISA is quite broad. ERISA preempts “any and all state laws insofar as they . . . relate to any employee benefit plan ...” 29 U.S.C. § 1144(a). The statute defines a law to include “all laws, decisions, rules, regulations, or other State action having the effect of law . . .” 29 U.S.C. §1144(c)(1). Drawing the distinction between state law causes of action that sufficiently “relate to” ERISA (and are thus preempted) and those that are only “tenuous, remote, or peripheral has proven considerably difficult in practice.” Hampers v. W.R. Grace & Co., 202 F.3d 44, 49 (1st Cir. 2000), quoting De Buono v. NYSA-ILA Med. & Clinical Serv. Fund, 520 U.S. 806, 809 n.1 (1997).
B. Relevant Case Law
1. United States Supreme Court Case Law
The Supreme Court has not yet indicated whether common-law misrepresentation claims such as Miara’s are. pre-empted by ERISA. See Miara, 379 F.Sup.2d at 33. Ingersoll-Rand v. McLendon, 498 U.S. 133 (1990), is perhaps the most oft-cited case for guidance on issues of ERISA preemption, and has been labeled the source of the current breadth of the ERISA “related to” preemption doctrine. Miara, 379 F.Sup.2d at 31. “A law ‘relates to’ an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.” Ingersoll-Rand Co., 498 U.S. at 139. There are two tests for determining whether a state law cause of action “relates to” an ERISA plan. Id. First, a cause of action relates to an ERISA plan if, “in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists . . .” Ingersoll-Rand, 498 U.S. at 140. Second, a state law cause of action would be preempted where “it conflicts directly with an ERISA cause of action.” Id. at 142.
The Supreme Court has recently attempted to rein in the encompassing breadth of the doctrine. New York State Blue Cross Plans v. Travelers Ins., 514 U.S. 645 (1995). In Travelers, the Court acknowledged the difficulty presented in construing the ambiguous phrase “related to” and stated; “[w]e simply must go beyond the unhelpful text and the frustrating difficulty of defining [the term ‘related to’], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.” Travelers, 514 U.S. at 656. The phrase has even, in fact, been termed “a semantic gremlin [that] should be exiled from the terminology of the law.” Industrial Technical Services v. Phoenix Home Life Mut. Ins. Co., 866 F.Sup. 48, 50 (D.Mass. 1994).
2. Massachusetts State Case Law
Two seemingly juxtaposed cases have confronted the misrepresentation issue head on. In the case of Pace v. Signal Technology Corp., 417 Mass. 154 (1994), an employer in severance negotiations informed the plaintiff Pace that he would be entitled to an additional six months coverage under the company’s long-term disability insurance (“LTDI”) if Pace agreed to accept a term severance (rather than a lump sum). Pace accepted the term severance and shortly thereafter was diagnosed with chronic, pro *70 gressive multiple sclerosis. The company’s LTDI provider thereafter denied Pace’s claimfor coverage on the ground that coverage was only available to active employees.
In holding that the claim did not “relate to” the relevant employee benefit plan, the Supreme Judicial Court (“SJC”) relied heavily on Cuoco v. NYNEX, Inc., 722 F.Sup. 884 (D.Mass. 1989), and specifically upon the language of that case that “(w)hen the resolution of state law claims will neither ‘determine whether any benefits are paid’ nor ‘directly affect the administration of benefits under the plan,’ the claims do not ‘relate to’ ERISA and accordingly are not preempted.” Pace, 417 Mass. at 159, citing Cuoco, 722 F.Sup. at 887, quoting Gilbert v. Burlington Indus., 765 F.2d 320, 327 (2d Cir. 1985), aff'd, 477 U.S. 907 (1986).
The case of Kelly v. Fort Dearborn Life Ins. Co., 422 Mass. 15 (1996), also involved a plaintiff who had been denied benefits under an insurance plan, the terms of which she had helped negotiate on behalf of the company. In this case, however, the plaintiff brought suit against the insurance company and its agent. Kelly, 422 Mass. at 16. The insurance company denied coverage on the basis that her disability was caused by a preexisting condition. Id. In a brief opinion, the SJC held that “(t]he claim unavoidably relates to the employer’s ERISA plan and is thus preempted by Federal law.” Kelly, 422 Mass. at 16-17.
3. United States Court of Appeals for the First Circuit Case Law
As Judge Young has indicated, the First Circuit has not explicitly ruled upon “whether ERISA preempts state law claims against an insurer, an insurance agency, and an insurance agent stemming from misrepresentations made by the insurance agent (acting on behalf of the insurer) prior to the establishment of the employee benefit plan in question.” Stetson v. P.F.L. Ins. Co., 16 F.Sup.2d 28, 31 (D.Me. 1998). Three First Circuit cases are particularly on point here.
In Vartanian v. Monsanto Co., Inc., 14 F.3d 697 (1st Cir. 1994), the plaintiff worked for the defendant employer for well over 30 years. Vartanian, 14 F.3d at 697. Plaintiff was a participant in the employer’s 1986 pension plan (“1986 Plan”). Id. The plan offered several options to retiring participants, including annuitized or lump sum payments. Id. Plaintiff submitted a lump sum distribution request in compliance with the rules of the 1986 Plan in March, 1990, anticipating a May 1991 retirement. Id. In February of 1991, plaintiff began to hear rumors that the company was planning to offer more lucrative early retirement packages, as it had a history of doing. Id. at 698. Plaintiff inquired with his supervisor as to the veracity of these rumors, to which his supervisor responded that the company had “no plans” of offering such early-retirement packages. Id. at 699. Plaintiff repeated this same inquiry a few months later, and received the same response. Id.
Approximately two months after plaintiffs May 1991 retirement, the company instituted a policy that involved consolidating the number of workers and restructuring the options available to participants in the 1986 Plan into a new plan (“1991 Plan”). Id. The company had, in fact, also been “seriously considering” this option at the time of the plaintiffs February inquiry. Id. The plaintiff alleged that this withholding of information was a misrepresentation in breach of the company’s fiduciary duty to him upon which he detrimentally relied. Id. The First Circuit was careful to point out that the plaintiff in that case “exhausted all administrative procedures and plan appeal procedures in his claim for benéfits under the 1991 Plan.” Id. The gist of the plaintiffs claim was that he should have been entitled to the benefits available to participants of the 1991 plan. Id.
Holding the misrepresentation claim preempted by ERISA, the First Circuit noted that “the existence of the 1991 Plan is inseparably connected to any determination of liability under state common law of misrepresentation. There is simply no cause of action if there is no plan.” Id. at 700.
In Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790 (1st Cir. 1995), the plaintiff was a former employee and participant in the employer-defendant’s retirement plan. Carlo, 49 F.3d at 790. When the plaintiff inquired about possible early retirement, the company’s personnel manager informed the plaintiff of his expected monthly benefit and indicated that the amount quoted had been certified by the corporate program administrator. Id. at 792. The plaintiff chose the early retirement option described. Id.
Approximately six months later, the company indicated in a letter to the plaintiff that it had miscalculated the benefits due to him and gave him the option of returning to his previous job. Id. The plaintiff did not accept this offer, and later brought suit against the company. Id. Acknowledging the “sweeping” nature of ERISA at that time (before Travelers), the court held that the plaintiffs claim was preempted. The court stated: “(i]f the [plaintiffs] were successful in their suit, the damages would consist in part of the extra pension benefits which [the employer] allegedly promised them. To compute these damages would require the court to refer to the [plan] as well as the misrepresentations made by [the employer]. Id. at 794.
4. United States District Court for the District of Massachusetts Case Law
In Cuoco v. Nynex, Inc., 722 F.Sup. 884 (1989), the divorcee-widow of a deceased Nynex employee sought relief for denial of coverage based upon a “series of promises and misrepresentations” made to her by the company. Cuoco, 722 F.Sup. at 886. The court held *71 the misrepresentation claims not preempted by ERISA. Essential to that court’s holding was the notion that the claims were based upon the misrepresentations made by the company and not on the ERISA plan at hand.
In Industrial Technical Services, 866 F.Sup. 48 (1994), the defendant-insurer indicated to the plaintiff-purchaser at the time of contracting that the insurance contract would “match” the terms of a competitor. Soon thereafter the plaintiff realized that the terms of the contract did not in fact match the competitor’s and sought redress therefore. The court held the action not to be preempted because the action would not require the court to “probe the internal workings of the defendant’s plan,” and was thus too tenuously related to ERISA to warrant preemption.
Miara places heavy reliance on Giannetti v. Mahoney, 218 F.Sup.2d 8 (2002). In that case, the plaintiff purchased a group disability policy from the defendant-insurer pursuant to alleged misrepresentations by the insured’s agent about the coverage the plan would provide in the event that the plaintiffs wife became disabled. The court there held the misrepresentation claims not to be preempted. In particularly pointed language, the court pointed out that “(a]t least five circuits, in opinions which this court finds convincing, have held that [ERISA] does not preempt claims against insurance professionals sued for misrepresentations in procuring an ERISA policy or inducing policy participation. Giannetti, 218 F.Sup.2d at 14.
C. Application of ERISA Preemption Standard to Miara’s Claims[12]
1. Negligent Misrepresentation
Insofar as the plaintiffs tort-based claims are concerned, this court finds persuasive, and in fact pervasive, the analysis of the Massachusetts SJC in Pace (and the consonant opinions of that and other courts) that where the resolution of a claim will neither determine whether any benefits are paid under an ERISA plan nor affect the distribution of any benefits under that plan, that claim is not preempted by ERISA.
In the case at bar, the plaintiffs tort-based damages do not hinge upon an interpretation or reading of the plan, and neither will their resolution determine or affect benefits paid under the plan. Rather, they can be easily discerned from other relevant documentation. The damages sought by Miara are easily discernible through, inter alia, credible testimony offered by Miara and the letters she received from Allmerica. As a converse example, the damages sought in Kelly, where the court held the claims preempted, would have required an interpretation of the plan as to what types of preexisting illnesses, if any, were covered thereunder. Miara’s claim requires no such reading of the DBP. Simply put, Miara’s misrepresentation claim is not aimed at obtaining ERISAbenefits.
Moreover, and as Judge Young has aptly pointed out, the binding First Circuit precedent (Carlo and Vartanian) is readily distinguishable from Miara’s misrepresentation claims. For starters, Miara’s claims are lodged against an insurance company and its agents, while Carlo’s claims were lodged against an employer and Vartanian’s against an employer-fiduciary. And further, Vartanian and Carlo were both decided before the Supreme Court undertook the reining-in of the “related to” doctrine in Travelers.
This court, therefore, holds the plaintiffs misrepresentation claim not to be preempted by ERISA.
2. Promissory Estoppel, Breach of Contract, Breach of Guaranty, and Breach of the Covenant of Good Faith and Fair Dealing
The plaintiffs remaining claims sound in contract. Any claim challenging the DBP itself would most certainly be preempted by ERISA; Miara accordingly does not challenge the DBP, but rather the procurement of it. That being the case, she must establish contractual elements outside of the DBP in order for the contract-based claims to stand. When this case was much younger, Judge Young, in holding the plaintiffs contract-based claims not to be preempted, pointed out that “Miara is suing an insurance agent and company for a breach of their agreement to recommend to the Miaras a plan with full spousal survivor benefits.” Miara, 379 F.Sup.2d at 63.
This court, now with the full benefit of discovery, must grant the defendants’ motions to dismiss the plaintiffs contract-based claims. The plaintiff has simply not alleged nor pointed the court to any facts that would support any iype of contractual relationship separate and apart from the DBP. Insofar as the plaintiff has alleged or pointed to any evidence indicating contractual remedies, they are based wholly on the DBP and are therefore preempted.
V. Standing
The defendants argue that Miara lacks standing to bring this suit because “each of the claims belongs unquestionably to NECLF.” In Massachusetts, to set forth a claim for misrepresentation, a plaintiff must show that the defendant either negligently or intentionally made a misstatement of fact, that the plaintiff reasonably relied on such representation, and that their reasonable reliance thereon resulted in injuiy. Barrett Assoc., Inc. v. Aronson, 346 Mass. 150, 152 (1963). Contrary to the defendants’ assertion that all of the plaintiffs claims belonged to NECLF, Miara claims that she personally sustained a monetary injury as a result of her reliance on the defendants’ misstatements.
*72 VI. Do Miara’s Claims Fail as a Matter of Law
The defendants argue that Miara’s remaining misrepresentation claim fails as a matter of law because the statements alleged were opinions and because any reliance undertaken by Miara was unreasonable as a matter of law.
Generally, injuries incurred through reliance upon statements of opinion are not actionable. Yerid v. Mason, 341 Mass. 527, 530 (1960). There are, however, exceptions to the general rule. An opinion becomes actionable where the parties to a transaction do not stand on equal footing and where one party is in a position where he does or should have superior knowledge of the subject of the alleged misrepresentation. Gopen v. American Supply Co., 10 Mass.App.Ct. 342, 345 (1980). An opinion is also actionable where it is “reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion.” Briggs v. Carol Cars, Inc., 407 Mass. 391, 396 (1990).
Preliminarily, many of the statements Miara alleges constituted misrepresentations could be deemed factual. For instance, Miara claims that “Mr. Baker and Mr. Bonasera told us that the PBGC insurance guaranteed all participants vested pensions and guaranteed 100% spousal benefits in the event anything were to happen to either myself or my husband.” Miara Aff. ¶7. This statement is an assertion of fact about the performance of the plan.
Assuming, arguendo, that the Baker and Bonasera statements are not deemed factual, Miara’s claim falls easily into either of the above-listed exceptions. Baker and Bonasera, both insurance professionals, were on vastly superior footing to Miara in regards to their knowledge of the performance and expectations of insurance products. Moreover, any statements made by the Baker and Bonasera could have been reasonably interpreted by Miara to imply that they knew the necessary facts to support their assertions regarding the performance of the DBP.
Yet further, the defendants’ argument that Miara’s reliance was unreasonable as a matter of law cannot stand. The reasonableness of a party’s reliance is generally a question of fact, although it can be a question of law in an appropriate case, such as when “the parties involved are of relatively equal knowledge and sophistication.” Cataldo Ambulance Serv. Inc. v. City of Chelsea, 426 Mass. 383, 387 (1998). This is certainly not such an extraordinary case. It is for a jury to determine whether Miara’s reliance on Baker and Bonasera’s statements, in light of the information available to her in the contract and the summary plan, was reasonable.
Conclusion
It is therefore ORDERED that the defendants’ motion for summary judgment as to the plaintiffs counts for (1) promissory estoppel; (2) breach of contract; (3) breach of guaranty; (4) breach of the covenant of good faith and fair dealing is ALLOWED and the defendants’ motion for summary judgment as to the plaintiffs claim for negligent misrepresentation is DENIED.

 Baker and Baker Associates are defendants in this case and their Motions for Summary Judgment are currently being considered by another Judge.

 This court questions whether the plan was even in effect for the five years before which it was terminated because the plaintiff stopped payments on the DBP in 1992. This question, however, can only be answered be reverting to an interpretation of the DBP pursuant to ERISA.

 Additionally, the Plan Summary indicates that termination of the DBP requires prior approval from the IRS.

 Miara’s anticipated result was to collect her 100% beneficiary interest through PBGC insurance, despite the fact that the DBP was under funded by the plaintiffs actions and without regard to a priority disbursement of insufficient funds to employees.

 The question certified was: “does ERISA preempt state law claims against an insurer, an insurance agency, and an insurance agent stemming from misrepresentations and assurances made by the insurance agent (acting on behalf of the insurer) in connection with the establishment of an employee benefit plan.” Miara, 379 F.Sup.2d at 108.

 In a lengthy opinion, Judge Young held that ERISA did not preempt any of the plaintiffs claims in this case. This court is cognizant of Judge Young’s well-reasoned and thoroughly-researched opinion, and indeed takes much guidance from it. This court, however, points out that the case presently sits at a vastly different procedural posture than it did before Judge Young. Judge Young’s opinion was issued before the commencement of the discovery process. In this matter, discovery is complete and the parties, as well as the Court, have the benefit of facts not available at the time of the remand order.

 The “inherently unknowable” standard is identical to and is used interchangeably with the “knew or should have known” standard. See Albrecht v. Clifford, 436 Mass. 706, 714 (2002); Williams v. Ely, 423 Mass. 467, 473 n.7 (1996).

 Although there is confusion over the precise execution date of the contract, all of the parties agree that it was sometime during 1990. If this court deems the statutes of limitation to have begun to run at any date in that year, they will have run before the date this action was filed. Thus, the precise date is immaterial.

 To repeat, the letter reads in relevant part: The [DBP] is in the process of submitting to the PBGC a request for a distress termination for their approval. At the current time, and at Mr. Miara’s death, the assets are, and were, less than the value of accrued benefits in the [DBP]. As a result, the PBGC may require Maria Miara to forego part of her benefit as a substantial owner of the employer so that non-owner participants can receive their full benefits. We do not know whether this possibility would have any effect on the valuation of the spouse’s pension for Federal Estate Tax purposes. (Emphasis added.)

 Both parties agreed at oral argument that Miara is bringing this suit in her individual capacity.

 The parties have not argued that the plaintiffs malpractice claim is preempted by ERISA.